# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 13-24566-CIV-COOKE/TORRES

ALFRED BELTRAN,

    Plaintiff,

vs.

NCL CORPORATION, LTD.
d/b/a NORWEGIAN CRUISE LINES, *et al.*,

    Defendant.

_____/

### ORDER ON DEFENDANT'S *DAUBERT* MOTION TO STRIKE PLAINTIFF'S EXPERT WITNESS TESTIMONY

THIS MATTER is before me on Defendant NCL Corporation, Ltd.'s ("Norwegian") *Daubert* Motion to Strike Plaintiff's Expert Witness Testimony ("Motion") (ECF No. 155), seeking to exclude the testimony of all five of Plaintiff's expert witnesses. Plaintiff Alfredo Beltran ("Mr. Beltran") filed his response in opposition (ECF No. 168), along with several exhibits, after which Defendant filed its reply (ECF No. 174). For the reasons discussed below, Defendant's Motion (ECF No. 155) is granted in part and denied in part.

### I.    BACKGROUND

Mr. Beltran brings this action against Norwegian for several counts of negligence, alleging that Norwegian's negligent actions led to the delayed treatment of Mr. Beltran's transverse myelitis, resulting in his paralysis. In December 2012, Mr. Beltran was set to take a cruise with Norwegian. Prior to boarding the cruise ship, Mr. Beltran went to see his primary care physician; he was experiencing pain and discomfort in his lower back and wanted to make sure he had his doctor's clearance before leaving on the cruise. His doctor ordered an MRI and determined that Mr. Beltran's symptoms were from a bulging disc. He gave Mr. Beltran some pain medication and cleared him to go on the cruise. Before leaving, Mr. Beltran rented a wheelchair for the trip. While Mr. Beltran used the wheelchair to board the ship, he was able to walk around the ship several times throughout the rest of the day.

However, that night, his back pain began to increase to the point of being "excruciating." He was also unable to urinate and decided to see the ship's doctor. The ship's doctor examined Mr. Beltran, but did not prescribe steroids or recommend that he be medically evacuated. Mr. Beltran's wife, however, requested that he be medically evacuated from the ship. Norwegian did not arrange for his evacuation and Mr. Beltran visited the clinic three more times over the course of three days. There is little record of his symptoms during those days. After disembarking at a port of call and flying back to Miami, Mr. Beltran was diagnosed with transverse myelitis.[1]

## II. LEGAL STANDARDS

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. It states the following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

A district court has the responsibility of acting as a gatekeeper to exclude unreliable expert testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). This gatekeeping function applies to "all expert testimony," whether based on "scientific knowledge" or "based on technical and other specialized knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). In performing this function, the district court's role is not "to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois U.K. Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but

---

[1] Transverse myelitis is "a segmental spinal cord injury caused by acute inflammation." Andrew Eisen, MD, FRCPC, *Disorders Affecting the Spinal Cord*, Wolters Kluer UpToDate (Oct. 17, 2011), *available at*: www.uptodate.com/contents/disorders-affecting-the-spinal-cord, ECF No. 168-16, p. 2.

admissible evidence." *Id.* (quoting *Daubert*, 509 U.S. at 596).

In order to determine the admissibility of expert testimony, a district court must consider three factors: (1) whether the expert is qualified to testify competently about the subject matter he intends to address, (2) whether the expert's methodology is sufficiently reliable, and (3) whether the testimony assists the trier of fact to understand the evidence through the application of the witness's expertise. *Quiet Tech.*, 326 F.3d at 1340–41. The party seeking to introduce expert testimony bears the burden of satisfying these criteria by a preponderance of the evidence. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

"A witness may be qualified as an expert by scientific training, education, or experience in a pertinent field or occupation." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004). However, "[a] lawyer with extensive experience in a particular area of law is not necessarily qualified to provide expert testimony on proper internal processes of the particular industry the lawyer represents." *Lopez v. Allstate Fire & Cas. Ins. Co.*, 2015 WL 5584898, at *5 (S.D. Fla. Sept. 23, 2015) (citing additional district court cases that support the point).

When analyzing whether an expert's testimony is reliable, "Rule 702 identifies three components of the reliability element: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Cincinnati Ins. Co. v. Cochran*, 2005 WL 2179799, at *2 (S.D. Ala. Sept. 2, 2005). "For nonscientific expert testimony, the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. . . . A district court may decide that nonscientific expert testimony is reliable based upon personal knowledge or experience." *Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC*, 555 F.3d 1331, 1338 (11th Cir. 2009) (internal quotation marks omitted). "In the context of an expert witness testifying on the basis of specialized experience, a reliable methodology means that the witness must explain how [his] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts [of the case]." *Lopez*, 2015 WL 5584898, at *6 (internal quotation marks omitted) (alterations in original).

Under the relevance factor, "expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person. . . . Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262–63.

### III. DISCUSSION

Norwegian challenges the admissibility of all Mr. Beltran's experts. Norwegian challenges Mr. Beltran's medical experts, Drs. Terrance D. Baker, John Bradberry, Waden E. Emery, Robert J. Kowalski, and Brad Herskowitz on the grounds that their expert conclusions that the delay in treating Mr. Beltran led to his paralysis are not based on proper methodology and are therefore not medically reliable and will not help the trier of fact. Norwegian further claims that the experts provide identical causal conclusions and their testimony is therefore prejudicially cumulative. Plaintiff contends that the "real nub of [Norwegian's] argument is causation; *i.e.* at what point Mr. Beltran's condition could not be improved with medical treatment" and is a classic jury question rather than grounds for a *Daubert* challenge. Resp., p. 1–2.

Norwegian also challenges Mr. Beltran's economist, Mr. Steven M. Collard, alleging he is not qualified to testify as an expert on economic issues and that the method he used in calculating Mr. Beltran's damages is not based upon reliable methodology or statistics.

**A. Mr. Beltran's Medical Experts**

As an initial matter, while Norwegian seeks to exclude the causation testimony of all the medical experts, Mr. Beltran has stated in his response that Drs. Baker and Bradberry "will be providing standard of care opinions," not causation opinions. Resp., ECF No. 168, p. 6. Mr. Beltran does not address their causation opinions, and neither will I. While Dr. Herskowitz's expert report includes a statement regarding causation, Mr. Beltran states his opinions may be limited to Mr. Beltran's current condition and future prognosis. I will therefore address the admissibility of his causation conclusions, as Mr. Beltran has preserved his right to have Dr. Herskowitz testify to them at trial.

**i. Qualifications**

Norwegian challenges the expert qualifications of Mr. Beltran's proffered experts, noting that "[n]one of these medical doctors are specialists or experts in Mr. Beltran's disease, transverse myelitis, . . . diminishing the reliability of their opinions." Motion, p. 6.

However, "[t]he proffered physician need not be a specialist in the particular medical discipline to render expert testimony relating to that discipline." *McDowell v. Brown*, 392 F.3d 1283, 1297 (11th Cir. 2004) (quoting *Gaydar v. Sociedad Instituto Gineco Quirurgico y Planifacacion*, 345 F.3d 15, 24 (1st Cir. 2003)). Nevertheless, Drs. Emery, Kowalski, and Herskowitz are all neurologists with exceptional qualifications, as well as experience with transverse myelitis. As discussed below, they are more than qualified to testify regarding the disease of transverse myelitis.

Dr. Waden E. Emery, III is a board-certified neurologist who currently treats Mr. Beltran for his transverse myelitis. Resp., p. 4 –5. He received his medical degree from Washington University and completed his residency in neurology at the University of Miami, where he is currently a Voluntary Assistant Professor in the Department of Neurology. ECF No. 155-3, 7, 9–10. Dr. Emery has been the Director of the Emery Neuroscience Center and the Waden E. Emery III MD PA since 1990. He is a member of the American Academy of Neurology, American Society of Neuroimaging, and the Florida Society of Neurology, among others. *Id.*, at 13–14. He has been a speaker or participant in 421 neurologic-related conferences, has published three peer-reviewed articles, and contributed to twelve medical research groups. Resp., p. 5. Over the past thirty-five years, he has treated around thirty-five patients with transverse myelitis. ECF No. 176-1, p. 9. Dr. Emery is qualified to testify on issues regarding transverse myelitis.

Dr. Robert J. Kowalski is a board-certified neurosurgeon. ECF No. 168-5, p. 7. He graduated from the University of South Florida College of Medicine and completed his residency at the Cleveland Clinic Foundation in Ohio, where he was a clinical fellow in complex spinal surgery immediately afterward. *Id.* Since 2009, he has been a neurosurgeon at the Florida Spine Institute, and for the past five years he has been the Medical Director of the Florida Spine and Neuro Center and an expert witness and consultant. *Id.* Prior to that he was a Neurosurgeon-Lieutenant Colonel in the U.S. Air Force Medical Corps for four years. Dr. Kowalski has experience working with patients with transverse myelitis. ECF No. 168-6, p. 19–20. Dr. Kowalski is also qualified to testify on issues relating to transverse myelitis.

Dr. Brad Herskowitz is Mr. Beltran's treating neurologist. Resp., p. 6. He is board certified and a member of the American Academy of Neurology. ECF No. 168-7, p. 8–9. He

5

is a treating neurologist at St. Anne's Nursing Center & Residence. *Id.*, p. 9. He has written several publications, but they appear to be unrelated to spinal issues. *Id.*, p. 9–10. Without more regarding his experience with transverse myelitis, I cannot say he is qualified to testify about causation; however, as Mr. Beltran's treating physician he should be more than qualified to testify as to Mr. Beltran's current condition and future prognosis.

Dr. Emery and Dr. Kowalski are qualified to render expert opinions on causation, i.e., the nature of the transverse myelitis and Mr. Beltran's resulting paralysis.

   ii.   **Reliability**

While Mr. Beltran's experts may be qualified to testify as to causation, even a "supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based on some recognized scientific method." *McDowell*, 392 F.3d at 1298 (quoting *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999). I must therefore "assess whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Frazier*, 387 F.3d at 1261–62.

Norwegian objects solely to Mr. Beltran's experts' testimony as it relates to their causation conclusions, specifically the statement in all the expert reports that says some version of: "Had Mr. Beltran been evacuated to an appropriate medical facility on December 22, 23, or 24, 2012, more likely than not he would not be paralyzed." ECF 155-4, p. 4; ECF 155-3, p. 4; *see* ECF No. 155-5, p. 4. While this specific statement itself might be overly broad, the causation analysis and conclusion itself, as fleshed out by the deposition of the experts, is supported by the medical literature and the experts' personal experience, and is sufficiently tied to the facts of this case.

In their depositions, both Drs. Emery and Kowalski more thoroughly discuss their causation analysis and tie their conclusion regarding Mr. Beltran's likelihood for improvement to the progression of his symptoms during his time on the cruise ship. As more fully discussed in depositions, saying that Mr. Beltran "would not be paralyzed" does not mean he would have made a full recovery, but rather that he could have "potentially had a functional outcome, at least able to ambulate with the assistance of crutches . . . ." ECF No. 168-6, p. 62. For example, Dr. Emery testifies that his opinion is that, had Mr. Beltran received treatment while he was in the acute phase of symptoms,

6

> it's medically probable that he would have some neurologic dysfunction, . . . [but] that the weakness would not be as severe. It's medically probable that he would be walking probably with a walker, or with crutches. It's medically probable that he would have partial erections. It's medically probable that he would not have the severe neurogenic bladder that he has and neurogenic bowel that he has.

ECF No. 176-1, p. 49. Dr. Kowalksi's opinion is similarly tied to the progression of Mr. Beltran's symptoms. ECF No. 168-6, p. 44–45. These opinions are based on both doctors' experience, as well as the medical literature. Both Dr. Kowalski and Dr. Emery are neurologists with experience with transverse myelitis. Dr. Kowalski specifically has experience in the emergency room diagnosing transverse myelitis, mostly as a "first provider" where he attempts to rule out structural lesions as a cause of the patient's symptoms.[2] ECF No. 168-6, p. 20–21. Dr. Emery also generally deals with patients after being called by emergency room physicians who suspect transverse myelitis as a differential diagnosis. ECF No. 176-1, p. 12.

The medical literature also discusses the standard of care of patients with transverse myelitis, as well as the acute and sub-acute phases of the disease and likelihood of recovery during the different phases. *See also* Yo Huh, *et al.*, *Clinical Insights for Early Detection of Acute Transverse Myelitis in the Emergency Department*, The Korean Society of Emergency Medicine, 48 (Mar. 31, 2015), ECF No. 168-17, p. 6. ("Because rapid progression and spinal shock in the course of ATM denote poor prognosis, rapid identification and early treatment are paramount for effective ATM treatment."); *Clinical Evaluation and Treatment of Transverse Myelitis*, AAN Summary of Evidence-based Guidelines for Clinicians, *available at*: www.aan.com/Guidelines/Home/GetGuidelineContent/502, ECF No. 168-12, p. 3 ("[A]ministration of high-dose IV methylprednisolone (1 g daily for 3 to 7 days) is typically the first treatment offered to hasten recovery, reduce disease activity, and restore neurologic function."); Andrew Eisen, MD, FRCPC, *Disorders Affecting the Spinal Cord*, Wolters Kluwer UpToDate (Oct. 17, 2011), *available at*: www.uptodate.com/contents/disorders-affecting-the-spinal-cord, ECF No. 168-14, p. 3.

Norwegian classifies this causation analysis as "the earlier, the better" theory and

---

[2] A patient presenting with a structural lesion of the spinal cord would generally rule out transverse myelitis.

relies on *McDowell v. Brown* to argue that Mr. Beltran's experts' conclusions are therefore too vague to be admitted. *McDowell v. Brown*, 392 F. d 1283, 1299 (11th Cir. 2004). In *McDowell*, Mr. McDowell was an inmate at the Dekalb County Jail and experienced back pain, an inability to urinate, and difficulty walking; however, he was not taken to the emergency room. *Id.*, at 1286. Throughout the night and the next day, his symptoms continued to worsen, but he was not taken to the emergency room until around noon. *Id.* By the time he reached the emergency room, he was experiencing paralysis in his legs, a result of what was later determined to be a spinal epidural abscess. *Id.* Mr. McDowell's experts aimed to testify that "the delay in treating the spinal epidural abscess caused or worsened his condition." *Id.*, at 1299. However, both doctors admitted that there was no medical literature or scientific evidence to back their theories. *Id.*, at 1299–1301. One doctor stated his theory is "simply common understanding, and doesn't rise to the level where someone would bother reporting that because everyone knows that." *Id.*, at 1300. The other doctor "frequently explained that his causation theory lacked empirical evidence or scientific support," and that his theory rested on "medical logic." *Id.*

As the court did in *Bentley v. Highlands Hospital Corporation*, I find *McDowell* to be distinguishable. *Bentley v. Highlands Hosp. Corp.*, 2016 WL 7446910, at *9 (E.D. Ky. Dec. 27, 2016). In *Bentley*, the court stated that

> while other courts have occasionally rejected generic medical testimony that 'earlier treatment is better,' those cases share flaws not present in this one: Drs. Pardo and DeLorenzo have reliably explained the mechanism by which steroids work, why earlier intervention is crucial in inflammatory myelopathies, and why they believe Bentley could have benefitted from it.

*Id.* That is exactly the case here. In Dr. Emery's deposition testimony, he explains how steroids work, why early intervention is critical in these types of cases, and how such treatment could have benefitted Mr. Beltran. ECF No. 176-1, p. 27–36. In addition, there exists medical literature stating exactly what Drs. Emery and Kowalski have concluded—that patients who receive steroids have better outcomes. Both Drs. Kowalski and Emery tie their causation testimony to Mr. Beltran's symptoms, whether they are acute or sub-acute, indicating what damage was likely happening to Mr. Beltran's spinal cord by the inflammation, and use that information to conclude that had Mr. Beltran received steroids

8

before reaching paralysis he would likely have maintained some function. Norwegian's expert essentially agrees that the best likelihood for recovery is treatment prior to permanent damage. *See* ECF No. 175-1, p. 11–21. As Mr. Beltran points out in his response, "[t]he experts[3] in this case actually agree that treating [transverse myelitis] before permanent paralysis occurs is the key to having a positive outcome; the only dispute here is whether that permanent damage occurred before or after Mr. Beltran boarded the ship." Resp., p. 14. I agree with Mr. Beltran that the issue of timing and causation is a question best left to the finder of fact. Any discrepancies in the literature or testimony of the experts can be used as fuel for cross-examination by Norwegian; however, it is not enough to exclude the opinion on a *Daubert* challenge.

Lastly, I find that the causation testimony is helpful to a jury who is likely not familiar with transverse myelitis and the progressive course of the disease.

### iii. Cumulative Effect of Expert Causation Opinions

Norwegian argues that all five experts testifying as to causation is cumulative. Were that the case, I would have to agree. However, Mr. Beltran has stated that two experts will not testify as to causation, and I have found that a third expert is not qualified to testify as to causation. That leaves two experts: Dr. Kowalski and Dr. Emery.

> Because of the powerful and potentially misleading effect of expert evidence, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403. Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury, or if the expert testimony is cumulative or needlessly time consuming.

*Frazier*, 387 F.3d at 1263. *See also* Fed. R. Evid. 403; *Tran v. Toyota Motor Corp.*, 420 F.3d 1310 (11th Cir. 2005). In my review so far of the depositions, the causation conclusions appear to be very similar; however, should Norwegian renew its objection based on cumulativeness, I will allow the Parties to briefly highlight the differences and similarities in the testimony in a motion *in limine* rather than address the issue at this stage.

---

[3] Norwegian's medical expert testified to a similar conclusion as Mr. Beltran's experts and survived a *Daubert* challenge in a case in the Seventh Judicial Circuit of Florida. *See* Order Denying Defendant's Motion to Exclude Causation Testimony and/or Evidence that Plaintiff's Recovery Would Have Improved If Steroids Were Administered, *Penny v. Memorial Hospital*, Case No. 2013-12384-CIDL, ECF No. 168-30.

### B. Mr. Beltran's Economic Expert

#### i. Qualifications

Norwegian challenges Mr. Steven Collard's qualifications as an economic expert because he has no degree in economics. However, Rule 702 is very clear that education is not the only way to be qualified as an expert.

> While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status. . . . The Committee Note to the 2000 Amendments of Rule 702 also explains that '[n]othing in this amendment is intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony.'

*Frazier*, 387 F.3d at 1260–61 (quoting Fed. R. Evid. 702 advisory committee's note (2000 amends.)). Mr. Collard has spent the past twenty-four years doing different work as a vocational economic analyst and currently teaches a course on tort damages at Nova Southeastern University Shepard Broad School of Law. ECF No. 155-7, p. 22. He has published eight articles relating to the time value of money regarding future earnings and future medical care costs and has presented five times on these issues. Resp., p. 16; ECF No. 155-7, p. 23–24. He has taken graduate level courses in finance and the economics of disability, and received his training with a nationally recognized firm, working on over 1,000 cases that involved "calculating the present value of a growing lump sum of future earnings and future medical care costs, such as with this report." ECF No. 155-7, p. 3. He has served as an expert witness in 51 other cases and his testimony has never been struck on a *Daubert* or *Frye* challenge. Resp., p. 16; ECF No. 168-31, p. 23. Mr. Collard is a member of the American Rehabilitation Economics Association and is more than qualified to testify as an expert in the field of economics.

#### ii. Reliability

Norwegian's main challenge to Mr. Collard's testimony is the negative 1.1% discount rate he applied in calculating Mr. Beltran's damages. Norwegian states that Mr. Collard's deposition testimony and report "are silent on his methodology for arriving at the rate he used" and it is not based on a government statistic or commonly accepted rate used by economists. Motion, p. 11, 12. However, Mr. Collard was not completely "silent" as to his methodology. In his report, he says he considered data from the U.S. Department of Labor, Bureau of Labor Statistics, including the Consumer Price Index and Medical

Consumer Price Index, short-term and long-term forecasts, and compared the data with past and current blow-market rates of various Treasury Bills and Notes. ECF No. 155-7, p. 3. The report also states that the Medical Care Cost index for March 2017 is 3.5%, indicating the "growth in cost of medical care is currently outpacing the return such investment could yield." *Id.* In his deposition, Mr. Collard admits that after reviewing this data, he decided not to use it and he came up with his own discount rate based on his experience. ECF No. 168-31, p. 50–55. He specifically chose 1.1% because he found it to be a good average that captured the loss in present value and would "smooth out" any irregularities. *Id.*, p. 54–55. He stated that over time, his experience has been that the rate has been closer to 1.1%. *Id.* at 51.

Norwegian maintains that a negative discount rate is *per se* unreliable and points to *Trevino v. United States,* where the Ninth Circuit found the district court's choice of a negative discount rate flawed because it used an aberrational time period. *Trevino v. U.S.*, 804 F.2d 1512, 1518 (9th Cir. 1986). Mr. Beltran then cites to *Culver v. Slater Boat Company (Culver II)*, where the Fifth Circuit held that a negative rate, not to exceed -1.5% and supported by appropriate expert opinion, could be permissible. *Culver v. Slater Boat Co. (Culver II)*, 722 F.2d 114, 122–23, (5th Cir. 1983). *Culver* is the more pertinent case, as it "required that courts in this circuit use the 'below-market discount' method to adjust awards of future damages to present value." *Self v. Great Lakes Dredge & Dock Co.*, 832 F.2d 1540, 1552 (11th Cir. 1987) (en banc). However, the Supreme Court has essentially overruled "the *Culver* mandatory requirement of a below-market-discount method." *Purdy v. Belcher Ref. Co.*, 781 F. Supp. 1559, 1563 (S.D. Ala. 1992) (citing *Monessen Southwestern Ry. Co. v. Morgan,* 486 U.S. 330 (1988)). The Eleventh Circuit then went on to say that neither *Culver* nor *Monesson* "requires that determining the discount rate must be performed by use of the below-market discount method rather than by the case-by-case method or the total offset method" in non-federal, diversity cases. *Ageloff v. Delta Airlines Inc.*, 860 F.2d 379, 389 (11th Cir. 1988), *modified*, 867 F.2d 1268 (11th Cir. 1989). Suffice it to say, I cannot find that Mr. Collard's use of a negative discount rate is *per se* unreliable based on case law. Mr. Collard has extensive experience on these issues and stated he chose the specific discount rate because, in his experience, it was more accurate. "For nonscientific expert testimony, the trial judge must have considerable leeway in deciding in a particular case how to go about

determining whether particular expert testimony is reliable. . . . A district court may decide that nonscientific expert testimony is reliable based upon personal knowledge or experience." *Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC*, 555 F.3d 1331, 1338 (11th Cir. 2009) (internal quotation marks omitted). The problems Norwegian has with Mr. Collard's discount rate can be dealt with in the traditional manner of vigorous cross-examination and the presentation of contrary evidence. *Quiet Tech.*, 326 F.3d at 1341.

## IV. CONCLUSION

In light of the above, Norwegian's Motion to Strike (ECF No. 155) is **GRANTED in part** and **DENIED in part**. Accordingly, it is hereby **ORDERED and ADJUDGED** as follows:

1. Mr. Beltran's expert witnesses Dr. Waden D. Emery, III and Dr. Robert J. Kowalski may testify at trial as to causation, subject to a possible motion *in limine* as to cumulativeness.
2. Mr. Steven Collard may testify as an expert witness as to damages.

**DONE and ORDERED** in chambers, at Miami, Florida, this 26th day of September 2017.

*[Signature: Marcia G. Cooke]*

MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Edwin G. Torres, U.S. Magistrate Judge*
*Counsel of record*